Jose Montalvo
_____
(Name)
480 Alta Road
_____
(Address)
San Diego, Ca. 92179
_____
(City, State, Zip)
CDCR P60879
_____
(CDCR / Booking / BOP No.)

2254 ___ 1983 ✓
FILING FEE PAID
Yes ✓ No
IFP MOTION FILED
Yes No ✓
COPIES SENT TO
Court ✓ ProSe

**FILED**

FEB 2 1 2019

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                        DEPUTY

# United States District Court
## Southern District of California

Jose Montalvo
_____,
(Enter full name of plaintiff in this action.)

                                    Plaintiff,

v.

Ralph Diaz, CDCR Secretary;
_____,
Kathleen Allison, CDCR Director;
_____,
Daniel Paramo, Warden at R.J.
_____,
Donovan State Prison,
_____
(Enter full name of each defendant in this action.)

                                    Defendant(s).

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**'19 CV0363 CAB JLB**

Civil Case No._____
(To be supplied by Court Clerk)

Complaint under the
Civil Rights Act
42 U.S.C. § 1983

## A. Jurisdiction

Jurisdiction is invoked pursuant to 28 U.S.C. § 1343(a)(3) and 42 U.S.C. § 1983. If you wish to assert jurisdiction under different or additional authority, list them below.

_____.

## B. Parties

1. Plaintiff: This complaint alleges that the civil rights of Plaintiff, Jose Montalvo
                                                                  (print Plaintiff's name)
_____, who presently resides at 480 Alta Road, San Diego, Ca. 92179
                                              (mailing address or place of confinement)
_____, were violated by the actions of

the below named individuals. The actions were directed against Plaintiff at R.J. Donpovan State
Prison _____ on (dates) 2/7/19 , _____, and _____
(institution/place where violation occurred)        (Count 1)    (Count 2)    (Count 3)

2. <u>Defendants</u>:  (Attach same information on additional pages if you are naming more than 4 defendants.)

Defendant ___Ralph Diaz_____ resides in __Sacramento_____ ,
               (name)                             (County of residence)

and is employed as a ___CDCR Secretary_____ .  This defendant is sued in
                           (defendant's position/title (if any))

his/her ☒individual ☒official capacity.  (Check one or both.)  Explain how this defendant was acting under

color of law: __See attached Declaration of Jose Montalvo and Memorandum of Law in Support of
Emergency Motion for Temporary Restraining Order._____

_____ .

Defendant ___Kathleen Allison_____ resides in __Sacramento_____ ,
               (name)                             (County of residence)

and is employed as a ___CDCR Director_____ .  This defendant is sued in
                           (defendant's position/title (if any))

his/her ☒individual ☒official capacity.  (Check one or both.)  Explain how this defendant was acting under

color of law: __See attached Declaration of Jose Montalvo and Memorandum of Law in Support of
Emergency Motion for Temporary Restraining Order._____

_____ .

Defendant ___Daniel Paramo_____ resides in __San Diego_____ ,
               (name)                             (County of residence)

and is employed as a ___Warden at Donovan State Prison_____ .  This defendant is sued in
                           (defendant's position/title (if any))

his/her ☒individual ☒official capacity.  (Check one or both.)  Explain how this defendant was acting under

color of law: __See attached Declaration of Jose Montalvo and Memorandum of Law in Support of
Emergency Motion for Temporary Restraining Order._____

_____ .

Defendant _____ resides in _____ ,
               (name)                             (County of residence)

and is employed as a _____ .  This defendant is sued in
                           (defendant's position/title (if any))

his/her ☐ individual ☐ official capacity.  (Check one or both.)  Explain how this defendant was acting under

color of law: _____

_____

_____ .

**C. Causes of Action** (You may attach additional pages alleging other causes of action and the facts supporting them if necessary.)

Count 1: The following civil right has been violated: _____ Eighth amendment: Defendants are acting

_____ Deliberate Difference to conditions posing a substantial risk of serious harm to Plaintiff. _____.

(E.g., right to medical care, access to courts, due process, free speech, freedom of religion, freedom of association, freedom from cruel and unusual punishment, etc.)

Supporting Facts: [Include all facts you consider important to Count 1. State what happened clearly and in your own words. You need not cite legal authority or argument. Be certain to describe exactly what each defendant, *by name*, did to violate the right alleged in Count 1.]

On December 12, 2017 Defendant Allison authored a department memorandum which announced the expansion of the merging of the SNY (Sensitive Needs Yard/ previously called Protective Custody) prisoners with the General Population Prisoners in all level 1 and 2 yards. On September 10, 2018, Defendant Diaz authored a department memorandum which sets forth the schedule for said merging the yards. Said memo states that all such facilities will be merged. On February 7th, 2019, Plaintiff was transferred to RJ Donovan State Prison to be merged with SNY prisoners. It has been long understood by both the Courts and CDCR officials that SNY prisoners cannot safely merge with General Population prisoners. Each and every time these merges have taken place intentionally or unintentionally, there has been well documented incidents of violence, whether the SNY prisoners attacked and assaulted the GP prisoners out of fear for their lives or were attacked and assaulted themselves by GP prisoners. This planned merge would place Plaintiff at serious risk of harm or injury and in violation of his right to be protected from violence. These Defendants are well aware of and are completely disregarding such an excessive risk to Plaintiff's health and safety. Each of these defendants are being sued both in their individual and official capacities.

Count 2:  The following civil right has been violated:  N/A
_____

(E.g., right to medical care, access to courts,

_____

due process, free speech, freedom of religion, freedom of association, freedom from cruel and unusual punishment, etc.)

Supporting Facts:   [Include all facts you consider important to Count 2. State what happened clearly and in your own words. You need not cite legal authority or argument. Be certain to describe exactly what each defendant, *by name*, did to violate the right alleged in Count 2.]

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

<u>Count 3</u>:  The following civil right has been violated:_____N/A_____

(E.g., right to medical care, access to courts,

_____.

due process, free speech, freedom of religion, freedom of association, freedom from cruel and unusual punishment, etc.)

<u>Supporting Facts</u>:   [Include all facts you consider important to Count 3. State what happened clearly and in your own words. You need not cite legal authority or argument.  Be certain to describe exactly what each defendant, *by name*, did to violate the right alleged in Count 3.]

**D. Previous Lawsuits and Administrative Relief**

1. Have you filed other lawsuits in state or federal courts dealing with the same or similar facts involved in this case? ☐ Yes ☒ No.

If your answer is "Yes", describe each suit in the space below. [If more than one, attach additional pages providing the same information as below.]

(a) Parties to the previous lawsuit:
Plaintiffs: _____ N/A _____

Defendants: _____

(b) Name of the court and docket number: _____

_____.

(c) Disposition: [ For example, was the case dismissed, appealed, or still pending?] _____

_____.

(d) Issues raised: _____

_____

_____

_____

_____.

(e) Approximate date case was filed: _____.

(f) Approximate date of disposition: _____.

2. Have you previously sought and exhausted all forms of available relief from the proper administrative officials regarding the acts alleged in Part C above? [E.g., CDCR Inmate/Parolee Appeal Form 602, etc.] ? ☒Yes ☐ No.

If your answer is "Yes", briefly describe how relief was sought and the results. If your answer is "No", briefly explain why administrative relief was not exhausted.

Plaintiff was included in a Group 602 administrative appeal regarding this issue, however, prison

officials refused to file and adjudicate said grievance. Moreover, in this exigent circumstance, Plantiff

will suffer irreparable harm unless the Court grants temporary relief to maintain the status quo pending

exhaustion.

_____

_____

_____

_____.

**E. Request for Relief**

Plaintiff requests that this Court grant the following relief:

1. An injunction preventing defendant(s):   Issue a Temporary Restraining Order and Preliminary Injunction enjoining the named Defendants, their successors in office and employees and all other persons acting in concerts and participation with them, from merging the SNY and GP prisoners together in what they refer to as Non-Designated Programming Facilities; Issue a declaratory judgment stating the Defendant's actions herein violate the violate Plaintiff's Eight Amendment to the United States Constitution and constitute deliberate indifference to Plaintiff's health and safety; and a Permanent Injunction prohibiting Defendants, their successors in office and employees and all other persons acting in concert and participant with them, from merging SNY and GP prisoners together.

2. Damages in the sum of $ _____.

3. Punitive damages in the sum of $ _____.

4. Other:_____

_____.

**F. Demand for Jury Trial**

Plaintiff demands a trial by ☒Jury ☐ Court. (Choose one.)

**G.  Consent to Magistrate Judge Jurisdiction**

In order to insure the just, speedy and inexpensive determination of Section 1983 Prisoner cases filed in this district, the Court has adopted a case assignment involving direct assignment of these cases to magistrate judges to conduct all proceedings including jury or bench trial and the entry of final judgment on consent of all the parties under 28 U.S.C. § 636(c), thus waiving the right to proceed before a district judge. The parties are free to withhold consent without adverse substantive consequences.

The Court encourages parties to utilize this efficient and expeditious program for case resolution due to the trial judge quality of the magistrate judges and to maximize access to the court system in a district where the criminal case loads severely limits the availability of the district judges for trial of civil cases. Consent to a magistrate judge will likely result in an earlier trial date. If you request that a district judge be designated to decide dispositive motions and try your case, a magistrate judge will nevertheless hear and decide all non-dispositive motions and will hear and issue a recommendation to the district judge as to all dispositive motions.

You may consent to have a magistrate judge conduct any and all further proceedings in this case, including trial, and the entry of final judgment by indicating your consent below.

Choose only one of the following:

☒ Plaintiff consents to magistrate judge jurisdiction as set forth above.

**OR**

☐ Plaintiff requests that a district judge be designated to decide dispositive matters and trial in this case.

_2 - 2 -19_____
Date

_____
Signature of Plaintiff

Jose Montalvo, Plaintiff in Pro Se

1  Jose Montalvo
2  CDCR No. P60879
   480 Alta Road
3  San Diego, Ca. 92179

4  **PLAINTIFF IN PRO SE**

5

6              **UNITED STATES DISTRICT COURT**

7          **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

8

| | |
|---|---|
| 9   JOSE MONTALVO          , | Case No.: |
| 10            Plaintiff, | |
| 11   vs. | **MEMORANDUM OF LAW IN SUPPORT** |
| 12 | **OF PLAINTIFF'S MOTION FOR A** |
| 13   RALPH DIAZ SECRETARY, CALIFORNIA | **TEMPORARY RESTRAINING ORDER** |
|      DEPARTMENT OF CORRECTIONS; | **AND PRELIMINARY INJUNCTION.** |
| 14 | |
| 15   KATHLEEN ALLISON, DIRECTOR, | |
|      DIVISION OF ADULT INSTITUTIONS, | |
| 16   CALIFORNIA DEPARTMENT OF | |
|      CORRECTIONS AND REHABILITATION; | |
| 17 | |
|      DANIEL PARAMO, WARDEN,  DONOVAN | |
| 18   STATE PRISON. | |
| 19            Defendants. | |

20

21

22              **STATEMENT OF THE CASE**

23       This is a civil rights action brought under 42 U.S.C. § 1983 by a state prisoner

24  whose being placed in dangerous conditions of confinement which poses a serious risk to his

25  safety. Plaintiff seeks a Temporary Restraining Order and a Preliminary Injunction to ensure that

26  his safety and well-being stays protected.

27              **STATEMENT OF FACTS**

28

MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION. - 1

As stated in the declarations and Plaintiff's verified complaint submitted with this motion, Defendants herein are attempting to merge/mix Sensitive Needs prisoners with the General Population prisoners at Donovan State Prison. This has resulted in serious injuries and death.

## ARGUMENT

## I. PLAINTIFF IS ENTITLED TO A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION

In determining whether a party is entitled to a Temporary Restraining Order or a Preliminary Injunction, courts generally consider several factors: whether the party will suffer irreparable injury, the "balance of hardships" between the parties, the likelihood of success on the merits, and the public interest. Each of these factors favors the grant of this motion.

### A. The Plaintiff is Threatened with Irreparable Harm

Plaintiff alleges that by merging the Sensitive Needs prisoners with the General Population prisoners at the institution he is confined is a "failure of prison officials to protect inmates from attacks by other inmates" and from "dangerous conditions" which is a clear violation of the Eight Amendment (*Farmer v. Brennan*, 511 U.S. 825, 832, 114 S. Ct. 1970 (1994)). It is well known, and well documented, that housing prisoners with safety concerns, such as Sensitive Needs prisoners (prisoners who are gang drop-outs, convicted of sex crimes, transgenders and informants) with General Population prisoners, creates an excessive risk of assault or death. The courts have also long recognized this (see e.g., *Bylery v. Deputy Warden*, 246 Fed. Appx. 512 (9th Cir. 2007); *Glick v. Walker,*272 Fed. Appx. 514 (7th Cir. 2008); *Jones v. Blanas,*393 F. 3d 918, 923 (9th Cir. 2004)).

Moreover, as a result of such recent merges/mixing of such prisoners, there has been a prevalence of assaults that have took place (see attached Declaration of Ruthie Montalvo hereto as Exhibit 'D'). As such, these Defendants are well aware of such a substantial and pervasive risk of harm and therefore are acting with deliberate indifference when authorizing and conducting such merges/mixes of such prisoner populations and "[A] prisoner need not wait until he is actually assaulted to state a claim for and obtain relief" *Farmer,* 511 U.S at 845. Because these Defendants have stated that such merge/mix shall take place at Plaintiff's institution and specific housing unit (see attached Declaration of Jose Montalvo hereto as Exhibit 'C'), he is threatened with such irreparable harm.

### B. The Balance of Hardships Favors the Plaintiff

In deciding whether to grant TRO's and Preliminary Injunctions, courts ask whether the suffering of the moving party if the motion is denied will outweigh the suffering of the non-moving party if the motion is granted (see e.g., *Mitchell v. Cuomo,* 748 F. 2d 804, 808 (2nd Cir. 1984) (holding that dangers posed by prison crowding outweighed state's financial and administrative concerns); *Duran v. Anaya,* 642 F. Supp. 510, 527 (D.N.M. 1986) (holding that prisoners' interest in safety and medical care outweighed state's interest in saving money by cutting staff)).

In this case, the potential harm to Plaintiff if he is merged or mixed as described above, is imminent, life threatening and irreparable. The sufferings Defendants will experience if the court grants the order will consist of maintaining the status quo. These two populations of prisoners have been separated for well over two decades and was always promoted by CDCR (see e.g., *Madrid v. Gomez,* 889 F. Supp. 1146, 1241 (N. D. Cal. 1995) (requiring validated SHU prisoners to "drop-out" and "debrief", become prison informants, thereby becoming

Sensitive Needs prisoners whose lives are in serious danger)). Therefore, Defendants will not suffer if the motion for a TRO and Preliminary Injunction is granted.

### C. Plaintiff is Likely to Succeed on the Merits

Plaintiff has a great likelihood of success on the merits. What Defendants are doing, mixing protective custody (Sensitive Needs) prisoners with General Population prisoners, has been specifically singled out by the United States Supreme Court as an example of unconstitutional "deliberate indifference" to prisoners' Eighth Amendment right to be reasonably protected from the constant threat of violence and assault by other inmates or from dangerous conditions at the prison and need not wait until an assault occurs to obtain relief (*Farmer v. Brenan,* 511 U.S. 825, 833-834 (1994)). The Ninth Circuit has also held such similar conduct to state and Eighth Amendment claim for failure to protect (see e.g., *Robinson v. Prunty,* 249 F. 3d. 862, 866-867 (9th Cir. 2001); and *Hearns v. Terhune,* 413 F. 3d. 1036, 1040-1042 (9th Cir. 2005)).

Moreover, the Defendants actions as claimed herein, meet the standard for deliberate indifference as these Defendants have long been aware of the substantial risk of serious harm that exists in placing any protected custody (Sensitive Needs) prisoner with General Population prisoners and are blatantly choosing to disregard it.

The memorandums Defendants authored, the statements made and the subsequent assaults that have already occurred as a result of such mixing of prisoners, clearly prove such callous disregard and further support Plaintiff's case.

### D. The Relief Sought Will Serve the Public Interest

In this case, the grant of relief will serve the public interest because it is always in the public interest for prison officials to obey the law, especially the Constitution. As submitted

to this court, the Declarations of Ruthie Montalvo and Kim McGill further support the public

interest, as over 3,000 family members impacted by the merging of SNY prisoners with GP

prisoners, have signed a petition and held numerous public demonstrations against such merging

by Defendants. Wherefore, it is clear that the public interest would best be served by the granting

of such requested relief.

## II. THE PLAINTIFF SHOULD NOT BE REQUIRED TO POST SECURITY
## AND EXHAUSTION OF ADMINISTRATIVE REMEDIES

Usually a litigant who obtains interim injunctive relief is asked to post security

(Rule 65(c), Fed. R. Civ. Pro.). However, Plaintiff is an indigent prisoner and is unable to post

security. The court has discretion to excuse an impoverished litigant from posting security (see

e.g., *Elliot v. Kiesewetter,* 98 F. 3d. 47, 60 (3rd Cir. 1996) (stating that district courts have

discretion to waive the bond requirement contained in Rule 65(c) if the balance of the equities

weighs overwhelming in favor of the party seeking the injunction); *Moltan Co. v. Eagle-Pitcher*

*Industries, Inc.,* 55 F. 3d. 1171, 1176 (6th Cir. 1995) (in view of the serious danger confronting

the Plaintiff, the court should grant the relief requested without requiring the posting of

security)).

Plaintiff should also be allowed such temporary relief without exhaustion of

administrative remedies to avoid irreparable harm. As stated within Plaintiff's verified

complaint, he and other prisoners attempted to file a group grievance with prison officials in

regard to this issue, however, it was rejected on the basis that a prisoner can not appeal a matter

that has yet to take place. This is contrary to the U.S. Supreme Court's ruling that "a prisoner

need not wait until he is actually assaulted to state a claim and obtain relief" (*Farmer,* 511 U.S.

at 845). Moreover, under the Prisoner Litigation Reform Act, courts retain their traditional

equitable discretion to grant temporary relief to maintain the status quo pending exhaustion (see

e.g., *Stringham v. Bick,* 2008 WL 4145473, *4 (E.D. Cal. Sept. 3, 2008)).

## CONCLUSION

For the foregoing reasons, the court should grant the motion in its entirety.

Dated: February 8, 2019.

Respectfully Submitted,

_____

, Plaintiff in Pro Se.

# DECLARATION OF JOSE MONTALVO

As a child, I grew up in Corona, California. I grew up in a low-income neighborhood. I was raised in an abusive home where alcohol was abused. I was taught to believe that violence solved everything. Violence was an everyday occurrence in my household, both toward my mother and toward me. I recall an instance where my father was intoxicated and threatened to kill us all in the car by driving erratically. My mother had to grab the steering wheel to stop us from having an accident.

Due to ongoing tension and fights in the household, I spent long nights without sleep, and therefore had a very poor attention to school. As I was struggling in school, my parents did not communicate with me in a positive way. Rather, in addition to physical abuse, I was repeatedly told I was stupid, and that I had no future.

I began running the streets to escape my home life. At the age of 14, I became a gang member and began using drugs and alcohol. I did not ever have a proper education and I believed I would never amount to anything.

I went to prison in 1998 and was released in 2004. I tried to live a good life, but I didn't have solid support to reintegrate into the community, and I continued to abuse alcohol. I was involved in a horrific motor vehicle accident and regrettably killed an innocent woman. I was sentenced to 21 years 4 months in California State Prison. As the reality of my sentence set in, I knew this was not the life I wanted to live. I turned to God and made the commitment to change my life.

I have reflected on my past actions with increasing clarity, insight and remorse. I'm not perfect, but I know that I do not want to ever revisit the type of life I used to lead. It has cost me my youth, the possibility of having a family of my own, and I have had minimal family support while incarcerated. Fortunately, I met my beautiful wife who has shown me what life is really about, and that the previous life I lived was nothing compared to what life has to offer. She has not only encouraged me, but has also inspired me to be a better man, to be the man that she deserves and can be proud of.

I have worked very hard toward my rehabilitation, including involving myself in self-help and education. I achieved my GED and achieved my Associates degree in Social and Behavioral Sciences in December 2018, and have earned dozens of vocational and self-help certifications.

Since I've been inside the state prison system, I've accomplished the following:

- GED
- Associates Degree in Social and Behavioral Sciences
- Certificate from Baylor University (Career Readiness)
- Certification in Braille Transcription (Registered in the Library of Congress)
- SAP
- Participation in AA
- Victim's Awareness
- Criminal Thinking
- Anger Management
- Stress Management
- Breaking Barriers
- Family Relations
- Chivalry
- Houses of Healing
- Men's Work
- Prep Gang Awareness
- Dangerous Contraband and Unauthorized Cell Phone and Components
- SAFE
- Abused Boys – Wounded Men
- Defy Ventures
- Gang Seminar
- Denial Seminar
- Masonry vocation
- Office Services
- Youth Offender Program mentor

The service I have given to others includes mentoring young people through the Youth Offender Program (YOP), where I have shared my experiences, so that they are discouraged from returning to prison and do not have to go through an extended period of incarceration - losing their freedom, their families, and the opportunity to live a positive life. In addition to sharing my experiences, I assisted with homework and encouraged them to pursue self-help and education.

I have also had an article published regarding my vehicular manslaughter to create awareness of the dangers of drinking and driving and the devastating effects on the victims, families, and the immense guilt you will carry the rest of your life for making an irresponsible decision to drink and drive leading to someone's death and/or injury.

The last time I had a disciplinary write up was in 2012 for a cell phone. I started on Level 4 because I was closed A custody, and I worked hard to come down to Level 1 with zero points.

I heard about the integration of General Population (GP) and Sensitive Needs Yards (SNY) through a publication from San Quentin News. I also was an Inmate Advisory Council member at Avenal

State Prison, where we were informed of the intension to integrate.

My concerns about this program are that R&R, housing and transportation have kept both people from SNY and GP separate for safety concerns. In the conversations that are happening among staff and those of us who are locked up, we are hearing that the merged yards are promoting violence and gladiator games. I met people that came from these merged yards that were victimized. They received disciplinary action, even though they were victims. These people were programming positively, and their write-ups included conflicting information claiming that they were deemed aggressors and program failures.

This experimental program has been forced upon people, and if we refuse to be a part of it, we will suffer the consequence of a serious 115, additional time, loss of familial connection due to placement in administrative segregation, and potential loss of good time credits, no matter how hard we have worked toward rehabilitation and positive programming.

There is also no guarantee of safety in this program. So, if people are attacked, they are punished for defending themselves – although these attacks can often be a matter of life and death.

My dreams for the future are to leave this prison life behind me, enjoy family life, give back to the community in some way to make up for the harm I caused, and experience what the world offers beyond prison.

I believe that the merging of the yards threatens my safety, all I have worked to achieve, and most importantly, the lives and freedom of everyone in the state prison system – both those of us who are locked up, as well as CDCR staff, civilian staff and thousands of volunteers.

Pursuant to 28 USC 1746, I declare under penalty of perjury that the foregoing is true and correct, dated this ___2___ day of (month) _____2_____, 2019 in _____ Prison.

_____

Jose Montalvo

-3-

# DECLARATION OF RUTHIE MONTALVO

The following statement is based on direct experiences I have had and my beliefs regarding things that pose a serious and imminent threat to my family. I am writing this declaration in support of the attached documents submitted to the court by my husband, Jose Montalvo.

I grew up in Orange County in an upper-class neighborhood and dreamt of getting married, having a family and a successful career. I met my husband through a mutual friend, and never in the years we have been together, would have thought I would one day worry about my husband being killed or injured in the California State Prison system.

I work for Vibra Heath Care as an Accounts Receivable Manager.  I manage the accounts for 26 long-term acute care and rehabilitation facilities located across the United States serving at least 2,000 patients – providing ICU-level care. Our patients require around-the-clock attention for serious medical illnesses or injuries such as debilitating accidents, strokes and comas.

I have been in the healthcare industry for 24 years including managing accounts for Children's Hospital Orange County, Pediatrix Medical Group and Adventist Health.

My future dreams are to have some normalcy in my life, to travel with my husband, to grow in my career and enjoy time with our families. I don't want to worry daily about my husband's safety, future, or if he will ever come home.

I have known my husband – Jose Montalvo - for almost six years. We were married on October 7th, 2014. He has been incarcerated for 20 years, and is currently at Avenal State Prison pending transfer to RJ Donovan NDPF yard. His release date is in January of 2020, but will be July 2019

-1-

1  due to him earning his Associates degree in Social and Behavioral Sciences.

2

3  I learned of the integration of the yards during an Inmate Family Council (IFC) meeting at Avenal

4  in March of 2018. It was on the agenda, and Associate Warden Christen Herrera handed out a

5  CDCR published document of "frequently asked questions."

6

7  Myself and the other family members were all in shock – we were in utter disbelief. People asked

8

9  why CDCR was doing this, and how and when they would begin integrating at Avenal. They stated

10  that Avenal wasn't yet on the calendar, but estimated that it would start by FY 2018-2019.

11

12  After the meeting, I started researching the policy as much as I could. I found out that they had

13  trialed it before on level 4, but it was disbanded due to violent outcomes.

14

15

16  Based on that research, I started to gather information from families at facilities where they had

17  already integrated to obtain further insight. Some of the incidents included riots, injuries including

18  stabbings, beatings with locks and other assaults at North Kern State Prison, New Folsom,

19  Corcoran and Pleasant Valley State Prisons.  I asked families to send their 115s along with any

20  other evidence, and began receiving mail from families and people inside whenever possible. I also

21  met people who were given 115s and then transferred to Avenal. I began to create a timeline and

22  supporting documentation of all the incidents I heard about.

23

24

25  With the mounting evidence, I would address concerns in the IFC meetings at Avenal – including

26  asking questions about the specific incidents. But the Warden and/or Associate Warden for that day

27  would claim that the incidents were minor, didn't lead to serious injuries, and that integration was

28  going well.

1
2     Out of concern and frustration, I started a family petition and a No NDPF social media page in
3     May of 2018. Within a few short months, we had thousands of people signed on to the petition and
4     using the page.
5
6     In May, I reached out to another family member and we dug into as much history and policy as we
7
8     could find on CDCR and government standards regarding the welfare and treatment of prisoners.
9     By the summer of 2018, we also started conference calls with families on a fairly regular basis. By
10    the fall 2018, one of the families reached out to get organizations to support us, and that's how the
11    Youth Justice Coalition got involved.
12
13    In November, families from across the state and Youth Justice Coalition members who had parents
14
15    or siblings incarcerated traveled to Sacramento, met with state legislative staffers, marched and
16    rallied at CDCR headquarters, and met with Acting CDCR Secretary, Ralph Diaz to present our
17    concerns and recommendations along with our family petition.
18
19    Despite the fact that we were only asking to stop the merging in order to get families, inmates and
20    CRCR frontline staff involved in a more responsible and safer plan, Diaz said he would only halt
21    the integration for one week and then move forward.
22
23    After that, families started organizing individual rallies at their facilities including California
24    Men's Colony, Soledad and Avenal. When I was rallying outside Avenal, a local City
25    Councilmember - Alvaro Preciado – stopped with his family in the car, and asked why we were
26
27    protesting. He committed to reaching out to the area Assemblymember Rudy Salas and put me in
28    touch with Salas' district staff, Alicia Ramirez. Ms. Ramirez reached out to Avenal, but instead of

1   forwarding her to a Warden, a counselor spoke with her and claimed that there was nothing to

2   worry about; that the Sensitive Needs Yards were just getting a new name. Councilmember

3   Preciado also met with the Warden at Avenal and reported back to me that she was very evasive

4   and defensive. He also asked me to speak at a City Council meeting, and the response at the City

5   Council was overwhelmingly positive – including a retired correctional officer whose wife still

6   works at Avenal who thanked me told me not to give up, to keep fighting.

7

8

9   We had a second rally at CDCR on December 14th, and followed up with the staff of state

10   legislators who we had met with in November.  Additional elected officials reached out and were

11   given varying and contradictory answers from CDCR. Ralph Diaz still hadn't responded to our

12   initial demands. Meanwhile, incidents including riots and assaults due to forced integration

13   continued to escalate.

14

15

16   Simultaneously, I was having conversations with my husband. He communicated that he was

17   concerned about his being forced to integrate onto a Non-designated Programming Facility

18   (NDPF), as well as worried he could potentially lose his good-time credits and prolong his

19   incarceration due to disciplinary action should he refuse to integrate or be attacked.

20

21   As a family member, I am most worried about my husband's safety. I try to remain strong, but it

22   weighs very heavily on me. The fear can become overpowering, and for many months,  I feel

23   completely helpless. At that point, I find myself lying awake at night, I struggle to make it through

24   the day, and my mental capacity has decreased. I experience daily anxiety and constant worry. Like

25   many family members I have met, I am quick to cry, although I have never been a crier. I feel as

26   though mine and my husband's whole future is jeopardized, and there is nothing I can do about it.

27

28

My husband has worked so hard to come home. He has completed his high school diploma and college Associate degree (from Coastline Community College), and is working on a second college degree. He has completed self-help programs such as Anger Management, Victim Awareness, Alcoholics Anonymous, Stress Management, Breaking Barriers, Chivalry, Houses of Healing, Men's Work, Prep Gang Awareness, Dangerous Contraband, SAFE, Abused Boys-Wounded Men, Defy Ventures, SAP, Family Relations, and Denial Seminar.

He has earned vocational certifications in career readiness (from Baylor University), masonry, office services, and is a certified Braille transcriptionist, for which he is registered in the Library of Congress' National Library Service for the Blind and Physically Handicapped. He has worked as a teachers' aid, a mentor for the YOP (Youth Offender Program), and served as a facilitator for self-help courses.

Project Rebound from Fresno State University also reached out to my husband to transfer into their program upon release.

The integration is happening to people who are so close to coming home. This erases all our loved ones have accomplished, robs people of their futures, and destroys the hopes of individuals, their children, spouses and extended families. I feel I have no option but to appeal to the court for help.

Pursuant to 28 USC 1746, I declare under penalty of perjury that the foregoing is true and correct, dated this 6th day of February, 2019 in Clovis, California.

Ruthie Montalvo

# DECLARATION OF KIM MCGILL

**Re: CDCR Implementation of NDPF (Non-Designated Programming Facilities)**

I am writing this declaration in support of Jose Montalvo's motion for a temporary restraining order and preliminary injunction.

I first heard about the merging of sensitive needs yards and general population within the California Department of Corrections and Rehabilitation in the fall, when Xochitl Quintero – whose husband is incarcerated – asked for the Youth Justice Coalition's help to support families who were worried about the policy. Since then, we have met weekly – both on phone calls and in person - to help families develop and lead a response.

**The implementation by California Department of Corrections and Rehabilitation of "Non-Designated Programming Facility" (NDPF) Yards**

Begun in the spring of 2018, this program merges SNY (Sensitive Needs Yards) and GP (General Population) into the same housing units, programming and yards. The program forces people to integrate who have been separated, for as long as twenty years, for safety reasons.

CDCR determined that people placed on Sensitive Needs Yards cannot program on a General Population yard safely due to a number of issues, including those who:

1. Are convicted of sexual assault;

2. Have informed on other people in the system;

3. Are former law enforcement;

4. Are gang "dropouts" – having left a gang and needing protection from retaliation; and

5. Are gay, transgender and gender nonconforming people

These yards were formerly known as "protective custody."

In addition, this included the removal of people from general population who were forced by CDCR to "debrief" – including often naming those involved in prison politics – in order to get out of solitary confinement. SHU confinements were often long-term, inhumane and debilitating, and many studies have determined that such confessions are not reliable. Furthermore, one person's release from solitary

-1-

confinement was at the expense of another person's confinement in the SHU, loss of good time credits and/or postponed eligibility for parole.

As the population in sensitive needs yards grew to nearly one-third the state's prison population, they began to replicate many of the problems in general population – including overcrowding, lack of adequate services, education and rehabilitative programming, medical epidemics and violence. The magnitude became unmanageable, and as conditions deteriorated, the prevalence of violence on many of these yards grew significantly.

In addition, over the past decade, people trapped in solitary confinement organized for changes in policy – including mobilizing several statewide hunger strikes and law suits – that brought international attention to the inhumane conditions and treatment in solitary confinement. This forced CDCR to address the arbitrary and long use of solitary confinement, and the dangerous requirement that people debrief – give names and information to CDCR about who was allegedly involved in "prison gang" activity – in order to earn release from the SHU. As described above, this policy also increased the potential for retaliatory violence within the system and contributed greatly to the dramatic growth in the SNY population.

In response to growing challenges on the sensitive needs yards, pressures to address misuse of the SHU, and litigation requiring programming for all yards in order to ensure equal access to education, vocations and rehabilitation, CDCR was forced to consider reintegration. But, rather than involving incarcerated people, their families and community volunteers working inside institutions in the development of a plan to reintegrate people safely, CDCR began, in the spring of 2018, to force the immediate reintegration of the yards. CDCR decided to first integrate the two groups across level 1-2 facilities, arguing that this would give equal opportunity for access to programs including education and self-help.

Originally, implementation was on a voluntary basis as in RJ Donovan and San Quentin. However, this has since been changed to forced integration, resulting in increased assaults, riots, stabbings, and beatings.

In addition, CDCR staff also threatened people afraid to integrate with disciplinary write-ups, elimination of good time credits / added time, and reports to the Board of Prison Terms to impact parole dates. Even people who had served decades in prison and were months short of coming home, were suddenly facing additional time.

There are also unethical tactics being utilized at multiple facilities. CDCR staff are interviewing people, referring to it as a "survey" of opinions. But, the consequences to this "survey" are extreme. People are questioned about willingness to program on an NDPF yard. If they say "no" or "no comment," people have

reported that they are threatened with a serious 115 (disciplinary write-up), possible transfer to a higher-level yard or facility, or transfer out-of-state. Many are being sent to an "emergency committee," and they are currently in the process of being transferred. Of course, people say they are declining to agree to a change in housing due to the hazards it poses to their safety and well-being, as well as the potential for conflicts that can lead to discipline, SHU confinement, increase in levels, or even the filing of new charges – all of which can negatively impact access to programming, review at parole hearings, eliminate chances for commutation or court release, and/or reduce good-time credits - all of which mean time added to sentences. Many people have worked hard to earn their way down from a level 3 or 4 yard to a level 1 or 2 over many years through participation in work, self-help, education and other positive programming.

For all of these reasons, the forced and immediate integration of the yards:

1.  Is increasing incidents of violence and conflict;

6.  Jeopardizes the milestones and growth people have worked so diligently to obtain;

7.  Will lead to longer sentences and increased incarceration costs, thus contributing to overcrowding that a federal law suit, AB 109 realignment and other changes in law and policies were intended to address; and

8.  Undermines efforts made through changes in state law to reduce overcrowding, increase fairness in sentencing, and reduce violence through greater access to rehabilitative programming and increased hope for release – including the legislature's passing of SB 9, SB 260, SB 261 and AB 1308, as well as the public's voting for ballot initiatives such as Propositions 47 and 57.

Families are also suffering greatly due to this program. With the loss of privileges and/or increased administrative segregation, family connection – the factor that contributes most to positive interactions inside facilities and lower recidivism when people come home – has been broken. Yards are increasingly on lockdown, eliminating phone calls, access to regular mail, visiting or family visiting. Families are also experiencing severe mental/emotional anguish, anxiety and fear without knowing if their loved ones are safe or if their opportunities to come home have been jeopardized.

In Mr. Montalvo's case, I believe that his wife's leadership role in the family-led effort to challenge CDCR's merging of the yards led Avenal State Prison to move him suddenly and without cause to Donovan over the past weekend of February 2nd and 3rd. This serves as a warning to others – "Speak out and you will be punished." Mr. Montalvo is only a few months away from paroling. Both he and his wife Ruthie worry that this will jeopardize his release.

-3-

Families across the state and members of the Youth Justice Coalition have met weekly to fight back. We have rallied outside CDCR and several institutions across the stare. We met with Acting CDCR Secretary Ralph Diaz and the command staff at the agency. We have met with the offices of several state legislators on four occasions – each time making the long trip from Los Angeles to Sacramento, including three days – November 2nd, December 14th and January 18th – when we also mobilized large numbers of family members to go to the Capitol and present their experiences and solutions. We sent an organizational sign-on letter to CDCR along with more than 6,000 signatures on two separate petitions, (including over 2,000 signatures collected by families of people inside, and nearly 10,000 signatures so far collected on our petition to both families and the larger community).

***Our demands are simple and reasonable. We have urged Ralph Diaz and CDCR to:***

1. Immediately end the integration of Sensitive Needs Yards into the general population - (e.g. families are concerned that people in general population are being integrated with people from Sensitive Needs Yards in smaller numbers, including Norco where people have reported having 5 general population individuals with 25 SNY individuals);
2. Meet with families and people inside through the established advisory councils and self-help groups in order to solicit ideas for full programming, access to medical and other resources, and possible plan for any future integration of people incarcerated within CDCR facilities;
3. Meet with advocacy and organizing groups who signed this letter – many of which are led by formerly incarcerated people and/or the families of incarcerated people, and others that work regularly inside the institutions – to further advise CDCR on these matters;
4. Meet with union membership to gather correctional officers' advice on these matters;
5. Develop a work group including representatives from people inside, formerly incarcerated people, family members and community organizations (among those who signed this letter) and task the work group to release a report on the best way forward to ensure programming, medical and mental health care, treatment, rehabilitation, safety and an environment free from racial and geographic hostilities, politics, violence and coercion for everyone in CDCR custody.

At our meeting with Secretary Diaz in November, we won a short, week-long "hiatus" on integration of the merging of yards system-wide. But since then, families, people inside and CDCR staff are once again reporting on forced merging, threats of discipline and report for the Board of Prison Terms (parole hearings), and acts of violence when populations are merged.

Therefore, I am writing this declaration in support of Jose Montalvo's motion for a temporary restraining order and preliminary injunction.

Pursuant to 28 USC § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on February 4th, 2019 in Los Angeles, California.

Kim McGill, Organizer
Youth Justice Coalition

28786⁴

To Reuse Envelope | 1 Peel off old labels | 2 Fold this flap down | 3 Expose adhesive | 4 Fold top flap down | 5 Press this flap up to seal

**Visit ups.com® or call 1-800-PICK-UPS® (1-800-742-5877)** to schedule a pickup or find a drop off location near you.

**Domestic Shipments**
- To qualify for the Letter rate, UPS Express Envelopes may only contain correspondence, urgent documents, and/or electronic media, and must weigh 8 oz. or less. UPS Express Envelopes containing items other than those listed or weighing more than 8 oz. will be billed by weight.

**International Shipments**
- The UPS Express Envelope may be used only for documents of no commercial value. Certain countries consider electronic media as documents. Visit ups.com/importexport to verify if your shipment is classified as a document.
- To qualify for the Letter rate, the UPS Express Envelope must weigh 8 oz. or less. UPS Express Envelopes weighing more than 8 oz. will be billed by weight.

**Note:** Express Envelopes are not recommended for shipments of electronic media containing sensitive personal information or breakable items. Do not send cash or cash equivalent.

## Reusable Express Envelope
### Legal Size

Reduce paper waste by using this envelope a second time – either to return to sender or with another recipient. See reuse instructions on flap above.

### Decision Green℠

Decision Green is UPS's environmental platform, reflecting our pursuit of sustainable business practices worldwide. For example, this envelope is made from 100% recycled material and is both reusable and recyclable.

100% Recycled fiber
80% Post-Consumer



2.0 LBS    LTR    1 OF 1

SHIP TO:
CLERK OF US DISTRICT COURT
333 W. BROADWAY STE # 420
SAN DIEGO   CA 92101

CA 921 9-10

UPS NEXT DAY AIR    1

TRACKING #: 1Z 984 077 01 4176 1179

BILLING: P/P

REF 1:28786

This envelope is for use with the following services:
- UPS Next Day Air®
- UPS Worldwide Express®
- UPS 2nd Day Air®

Do not use this envelope for:
- UPS Ground
- UPS Standard
- UPS 3 Day Select®
- UPS Worldwide Expedited®

Apply shipping documents on this side.

Serving you for more than 100 years
United Parcel Service.



International Shipping Notice — Carriage hereunder may be subject to the rules relating to liability and other terms and/or conditions established by the Convention for the Unification of Certain Rules Relating to International Carriage by Air (the "Warsaw Convention") and/or the Convention on the Contract for the International Carriage of Goods by Road (the "CMR Convention"). These commodities, technology or software were exported from the U.S. in accordance with the Export Administration Regulations. Diversion contrary to U.S. law prohibited.

01015281212  4/14  PAC  United Parcel Service

This envelope made of recycled paper can be used twice – a more intelligent use of resources.

Logistics is all about efficiency, service and smart ways of moving things around the planet.

WE ⌾ LOGISTICS™





CLERK OF US DISTRICT COURT
333 W BROADWAY
STE 4290
SAN DIEGO CA 92101-3805

P: WHITE  S:2
DOLL-1073 × 1:
1770                1030
1204407701417B

Reusable Express Envelope

Extremely Urgent

This envelope is for use with the following services:   UPS Next Day Air®
UPS Worldwide Express™
UPS 2nd Day Air®