Jose Montalvo
2410 Herndon Ave., #104
Clovis, Ca. 96311

**FILED**

Feb 18 2020

**CLERK, U.S. DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**
BY _____ s/ ArianaF _____ **DEPUTY**

*PLAINTIFF IN PRO PER*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSE MONTALVO,<br><br>       Plaintiff,<br><br>vs.<br><br>RALPH DIAZ, ET AL,<br><br>       Defendant | Case No.: 19-cv-00363-CAB<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS.** |

Plaintiff, Jose Montalvo respectfully submits the following Memorandum of

Points and Authorities in opposition to Defendant's Motion to Dismiss.

**STATEMENT OF FACTS**

On December 12, 2017 Defendant Allison authored a department memorandum

which announced the expansion of the merging of the SNY (Sensitive Needs Yard/previously

called Protective Custody) prisoners with the General Population Prisoners in all level 1 and 2

yards. On September 10, 2018, Defendants Diaz and Allison authored a CDCR departmental

memorandum which sets forth the schedule for said merging the yards. Said memo states that all

such facilities will be merged. On February 7, 2019, Plaintiff was transferred to RJ Donovan

State Prison to be merged with SNY prisoners. It has been long understood by both the Courts

and CDCR officials that SNY prisoners cannot safely merge with General Population prisoners.

Each and every time these merges have taken place intentionally or unintentionally, there has

been well documented incidents of violence, primarily as the result of the SNY prisoners

attacking GP prisoners forcefully placed on the yard with them.  This planned merge would place

Plaintiff at serious risk of harm or injury and in violation of his right to be protected from

violence. These Defendants are well aware of and are completely disregarding such an excessive

risk to Plaintiff's health and safety.

           On 2/8/19, Petitioner arrived at RJ Donovan and was advised they did not know

why he was transferred there, as there was no available housing for him.  He was sent directly to

administrative segregation.  On 2/11/19, Plaintiff was taken to committee and put on the

minimum yard (M yard), level one, which is an NDPF (merger yard populated by SNY

prisoners).  On this day Plaintiff was approached by three inmates who battered him, and an

additional ten more "NDPF" (SNY) prisoners joined in.  Plaintiff suffered a broken nose,

contusions, abrasions and slices on his face and neck. According to Defendant's version, the

attackers were identified as striking him in the head and torso areas; yet, (according to

Defendants) the attackers ran back into the building and were unable to be identified.  Plaintiff

was then placed back in administrative segregation, according to Defendants, "for his own

protection".  On 2/13/19, Plaintiff was taken back to the minimum yard (M yard), level one,

NDPF (merged) yard, where he was just battered 48 hours prior to, which then led to another

physical altercation between Plaintiff and a NDPF (SNY) prisoner. Plaintiff was then placed

back in administrative segregation.  On 2/22/19, Plaintiff was taken to committee and it was at

the recommendation of the counselor and captain present that he be transferred to a GP yard,

level 2, as he could not safely program on an NDPF yard. Jose went back to administrative

segregation upon completion. On 2/28/19, Jose was taken to committee again before Defendant

Covello.  At that time, Defendant Covello asked Plaintiff "what would happen if I put you on E

yard (level 2 NDPF yard)?" Plaintiff responded, "I am a General Population inmate. I program

with General Population Inmates." Defendant Covello then snapped and said: "send him, get

him out of here". Defendant Covello also asked Plaintiff: "how much time do you got to lose?";

stating: "We've got level three and four yards where you will go to next. Plaintiff was then

taken back to another higher level (level 2) NDPF yard at RJ Donavan as placed in an eight-man

cell. Plaintiff was approached by these inmates and immediately involved in another altercation

with an NDPF (SNY) prisoner then jumped by three other NDPF (SNY) inmates simultaneously.

As such, each of these defendants are being sued both in their individual and official capacities.


### STATEMENT OF LAW

Plaintiff alleges that by merging the Sensitive Needs prisoners with the General

Population prisoners at the institution he is confined is a "failure of prison officials to protect

inmates from attacks by other inmates" and from "dangerous conditions" which is a clear

violation of the Eight Amendment (*Farmer v. Brennan,* 511 U.S. 825, 832, 114 S. Ct. 1970

(1994)). It is well known, and well documented, that housing prisoners with safety concerns,

such as Sensitive Needs prisoners (prisoners who are gang drop-outs, convicted of sex crimes,

transgenders and informants) with General Population prisoners, creates an excessive risk of

assault or death. The courts have also long recognized this (see e.g., *Bylery v. Deputy Warden*,

246 Fed. Appx. 512 (9th Cir. 2007); *Glick v. Walker*, 272 Fed. Appx. 514 (7th Cir. 2008); *Jones

v. Blanas,* 393 F. 3d 918, 923 (9th Cir. 2004)). What Defendants are doing, mixing protective

custody (Sensitive Needs) prisoners with General Population prisoners, has been specifically

singled out by the United States Supreme Court as an example of unconstitutional "deliberate

indifference" to prisoners' Eighth Amendment right to be reasonably protected from the constant

threat of violence and assault by other inmates or from dangerous conditions at the prison and need not wait until an assault occurs to obtain relief (*Farmer v. Brenan*, 511 U.S. 825, 833-834 (1994)). The Ninth Circuit has also held such similar conduct to state and Eighth Amendment claim for failure to protect (see e.g., *Robinson v. Prunty*, 249 F. 3d. 862, 866-867 (9th Cir. 2001); and *Hearns v. Terhune*, 413 F. 3d. 1036, 1040-1042 (9th Cir. 2005)).

Moreover, the Defendants actions as claimed herein, meet the standard for deliberate indifference as these Defendants have long been aware of the substantial risk of serious harm that exists in placing any protected custody (Sensitive Needs) prisoner with General Population prisoners and are blatantly choosing to disregard it.

## DEFENDANT'S MOTION SHOULD BE DENIED BECAUSE THE COMPLAINT STATES FACTS ENTITILING PLAINTIFF TO RELIEF.

In testing the sufficiency of a complaint as against a motion to dismiss for failure to state a cause of action, the Court should deem the allegation in the complaint, as well as reasonable inferences raised therein, as admitted. *In re Colonial Mortgage Bankers Corp.*, 324 F.3d 12, 15-16 (1st Cir. 2003) (when ruling on motion to dismiss for failure to state a claim upon which relief can be granted, all well-pled allegations are accepted as a true and all reasonable inferences should be construed in favor of the non-moving party); *Kessler v. Monsour*, 865 F. Supp. 234, 236 (M.D. Pa. 1994) (motion to dismiss for failure to state a claim upon which relief can be granted is used to test the legal sufficiency of a complaint, while assuming the truth of well-pled factual allegations in it). Moreover, if the complaint states facts constituting a cause of action entitling plaintiff to any relief, the motion to dismiss should be denied. *Youse v. Carlucci*,

867 F. Supp. 317, 318 (E.D. Pa. 1994) ("A complaint is properly dismissed only if it appears certain that the plaintiff cannot prove any set of facts in support of its claim which would entitle it to relief"). As is demonstrated herein, the complaint sufficiently alleged facts which would overcome the defendant's claim that the cause of action is barred by the applicable statue of limitations.

In deciding a motion to dismiss, the court is required to "accept the allegations of the complaint as true and construe those allegations, and any reasonable inferences that might be drawn from them, in light most favorable to the plaintiff" *Kay v. Bemis,* 500 F. 3d 1214, 1217 (10th Cir. 2007) (see, also, *Erickson v. Pardus,* 551 U.S. 89, 94 (2007)).  Moreover, Plaintiff also asks the Court to hold his Pro Se pleadings to "less stringent standards than those drafted by lawyers" (*Haines v. Kerner,* 401 U.S. 520 (1971)).

While Plaintiff does concede that Defendant's are correct in that Plaintiff failed to state a claim for relief against Defendant Ndoh; liberally construed, his Amended Compliant sufficiently states a claim for relief against all other Defendants.

With regard to Defendants Diaz and Allison, these Defendants were personally in a meeting at CDCR Headquarters on November 5th, 2018 with prisoner family members and the Youth Justice Coalition wherein these two Defendants admitted to designing and ordering the NDPF merger. They also therein admitted knowing that prisoners would be physically harmed as a result (see attached Declaration of Ruthie Montalvo marked as Exhibit 'A").

Moreover, the law was clearly established by 2017 (the year these Defendants decided to implement the NDPF merger) that these two populations could not safely be mixed or housed together (e.g. see *Robinson v. Prunty,* 249 F. 3d. 862, 866-867 (9th Cir. 2001); and *Hearns v. Terhune,* 413 F. 3d. 1036, 1040-1042 (9th Cir. 2005)).

Moreover, prior to Plaintiff being placed on the NDPF yard at R.J. Donovan, there had been numerous attacks against General Population prisoners forced onto these yards with substantial injuries (see Exhibit "A" hereto).

Wherefore, these two Defendants were clearly well aware of and disregarded an excessive risk to prisoners' health and safety when they ordered the force merging of General Population and Sensitive Needs Yard prisoners.

Other California District courts have found similarly situated prisoners to state a claim for relief with regard to these two Defendants and claims as liberally construed (see, *Kester v. Diaz, et al;* U.S. District Court for the Northern District of California, case no. 19-cv-04205-JST; and *Cruz v. Diaz, et al;* U.S. District Court for the Northern District of California, case no. 19-cv-01974-LHK).

And because Plaintiff herein verified his complaint and gave specific details in regards to the memo created by and signed by these two particular Defendants. In their Motion to Dismiss, Defendants are now arguing their innocence and therefore creating a factual dispute in which such genuine issues of material fact must them be decided by a jury. They have also submitted documentary exhibits in which the court must now ignore them or convert their motion into a motion for summary judgment (Rule 12(b), Fed. R. Civ. P).

Nevertheless, the memo Defendants are referring to was dated and circulated in December of 2017. Thereafter, many well documented incidents of violence had occurred including the meeting referred to in 2018 wherein these two Defendants were made well aware of the dangers and incidents themselves (see attached Exhibit 'A' hereto). Plaintiff Montalvo was forced into a NDPF yard and severely assaulted and injured on 2/11/2019. As such, they had

plenty of notice of the risk and harm created and yet clearly failed to take any action to prevent or stop this despite it being totally in their power to do so.

In regards to Defendant Covello, Plaintiff's Amended Complaint clearly states facts sufficient to show the specific involvement and participation of Defendant Covello's collusion and deliberate indifference to Plaintiff's safety with a malicious approach.

Defendant's Motion to Dismiss with regard to Defendant Covello, they are making factual disputes rather than any deficiencies in Plaintiff's claims and therefore the court is again urged to "accept the allegations of the complaint as true and construe those allegation, and any reasonable inferences that might be drawn from them, in the light most favorable to the Plaintiff" (*Kay,* supra) and thus the Court is urged again to ignore them or convert their Motion to Dismiss into a Motion for Summary Judgment (Federal Rules of Civil Procedure, Rule 12(b)).

As stated previously, the law was well established that these two prisoner populations could not be safely mixed, let alone forced to mix at the time Plaintiff Montalvo was seriously injured as a result of Defendants acts and failures to act as stated in his Amended Complaint (see, *Robinson v. Prunty,* 249 F. 3d. 862, 866-867 (9th Cir. 2001); and *Hearns v. Terhune,* 413 F. 3d. 1036, 1040-1042 (9th Cir. 2005)) and therefor are not entitled to qualified immunity.

Finally, Plaintiff herein concedes that his request for Declaratory and Injunctive Relief are moot and that he no longer pursues those remedies of relief. However, Plaintiff does seek and is entitled to pursue compensatory and punitive damages from each Defendant.

//

//

**IF THIS COURT BELIEVES THAT PLAINTIFF HAS NOT ADEQUATELY STATED FACTS CONSTITUTING DELAYED DISCOVERY, IT SHOULD GRANT PLAINTIFF LEAVE TO AMEND HIS COMPLAINT.**

If this Court believes Plaintiff has failed to adequately allege facts to show delayed discovery, he requests leave to amend her complaint. Great liberality should be exercise in permitting a plaintiff to amend. *Dussouy v. Gulf Coast Inv. Corp.,* 660 F.2d 594, 598 (5th Cir. 1981) (leave to amend should be liberally given unless there is good cause to deny it); *Hudson v. McHugh,* 148 F.3d 859, 864 (7th Cir. 1998) (trial court should have allowed the plaintiff an opportunity to amend the complaint). If this Court is inclined to grant the Defendant's motion, Plaintiff should be permitted to amend his complaint to state facts that clearly show that he is entitled to relief.

**CONCLUSION**

Based on the foregoing, Plaintiff respectfully requests that this Court deny the Defendant's motion to dismiss for failure to state a cause of action and order him to answer Plaintiff's complaint within ten (10) days from the date of this hearing, or in the alternative, grant Plaintiff leave to file a Second Amended Complaint.

Date: February 14, 2020.

Respectfully Submitted By:

Joe Montalvo, In Pro Per

## DECLARATION OF RUTHIE MONTALVO

**Re: CDCR Implementation of NDPF (Non-Designated Programming Facilities)**

I am writing this amended declaration in support of Jose Montalvo's Order to Show Cause. I have personal knowledge of the matters set forth herein, and if called to as a witness, I could testify.

**Declarant's Background**

I am a former Inmate Family Council Chairperson at Avenal State Prison, which met with the Warden and support staff bi-monthly to discuss matters regarding visitation, inmate safety, inmate programming, and family unification. As IFC Chair, I would formalize an agenda with items families wanted addressed and lead the meeting accordingly. I am employed as an Accounts Receivable Manager. I manage the accounts for 26 long-term acute care and rehabilitation facilities located across the United States. I have been in the industry of revenue cycle management for 24 years including managing accounts for Children's Hospital Orange County, Pediatrix Medical Group and Adventist Health.

**Notice to Me**

I first heard of CDCRs plan to merge the General Population prisoners and Sensitive Needs Yards prisoners on an NDPF (Non-Designated Programming Facility) within the California Department of Corrections in March 2018, as I had placed the item on the Inmate Family Council (IFC) meeting at Avenal State Prison. During this meeting, Associate Warden, Christen Herrera, handed out a CDCR published document of "frequently asked questions" dated April 2018. Myself and the other family members were all in shock – we were in utter disbelief. People asked why CDCR was doing this, and how and when they would begin integrating at Avenal. They stated that Avenal was not yet on the calendar, but estimated that it would start by FY 2018-2019.

**CDCR Memorandums**

Upon further research, I discovered several memorandums created by CDCR in preparation for NDPF. CDCR Memorandum dated September 26, 2016, written by Kathleen Allison (Director of Division of Adult Institutions) informed CDCR Associate Directors, Division of Adult Institutions, Wardens, Classification and Parole Representatives, Classification Staff Representatives and Correctional Counselors II, Reception Centers activating Richard J. Donovan Correctional Facility. Said memo provided the "activation criteria" prisoners should meet before entering the program.

CDCR Memorandum dated November 18, 2016, written by Kathleen Allison (Director of Division of Adult Institutions) informed CDCR Associate Directors, Division of Adult Institutions, Warden, Classification Staff Representatives, Classification and Parole Representatives and Correctional Counselors II, and Reception Centers of the NDPF implementation at Richard J. Donovan Correctional Facility, level 2. Said memo stated "Inmates non-complaint with transfer and/or housing placement recommendation shall be subject to the departmental disciplinary process and potential placement into higher level housing".

CDCR Memorandum dated November 30, 2017, written by Kathleen Allison (Director of Division of Adult Institutions) and Katherine Tebrock (Deputy Director of Statewide Mental Health Program), informing CDCR Associate Directors, Division of Adult Institutions, Wardens, Chief Executive Officers, Chiefs of Mental Health and Classification and Parole Representatives of a Statewide Non-Designated Enhanced Outpatient Program and Inpatient Treatment Initiative. Said memo stated "effective January 8, 2018, CDCR is transitioning to non-designated units for institutions that provide EOP and inpatient treatment services".

CDCR then published a memorandum dated December 12, 2017, written by Kathleen Alisson

discussing the Non-Designated Programming Facility Expansions for 2018. Memo was sent to Associate Directors, Division of Adult Institutions, Wardens, Classification Staff Representatives, Classification and Parole Representatives, and Correctional Counselors III, and Reception Centers. Said memo stated "CDCRs Level 1 and Level 2 housing facilities will slowly be transitioned into non-designated PFs, as they currently house a large population of programming inmates". Memo also provided an outline of the facilities that were scheduled to convert into NDPF and when the transition was scheduled to take place. Such memo also stated that the two initial prisons to convert to NDPF: Richard J. Donovan Correctional Facility and California Health Care Facility experienced "successful integration". It is important to note that Richard J. Donovan integrated on a voluntary basis, as there was a flyer produced informing the prisoners to contact their counselors if they were interested in the program.

CDCR Memorandum dated April 26, 2018, written by Kathleen Allison discussed the plan for Transitioning Minimum Support Facilities to Non-Designated Programming Facilities. Memo was sent to Associate Directors, Division of Adult Institutions and Wardens. This memo was a guide to the previous December 12, 2017, memo (mentioned above) and also included a conversion schedule. This April 2018 memo stated that, "In April of 2016, a Sensitive Needs Yard (SNY), Summit was convened to develop a plan which would address the growing SNY population and the associated increase in violence which was occurring on the SYN facilities." To add to that statement, I would also like to include a YouTube link, created by Fox 11 news, where Correctional Officer Robert Clayton stated, "I've had inmates request to go back to the mainline of General Population because they were more afraid of SNY gangs.. Additionally, he stated, "we have guys that ask for protection all the time off of a protection yard". The video also named a few SNY gangs and then stated that, "since the 1990s the list has grown to more than two dozen SNY gangs…. There are now SNY gangs in 22 of the state's 33 prisons. Please see YouTube video

named "Prison SNY Gangs 2".

CDCR Memorandum dated July 16, 2018, written by Scott Kernan (Former CDCR Secretary), discussed NDPF expansions for 2018-2019. Memo was sent to Associate Directors, Division of Adult Institutions, Wardens, Classification Staff Representatives, Classification and Parole Representatives, and Correctional Counselors III, Reception Centers. Memo provided an update to the 12/12/17 memo written by Kathleen Allison, including an outline of the facilities scheduled to convert to NDPF and when the transition was scheduled to take place. It also stated, "It is CDCRs goal to slowly transition all Level 1, Level 2, and select Level 3 housing facilities into NDPFs, as they currently house a large population of programming inmates".

CDCR Memorandum dated September 10, 2018, written by Secretary of CDCR, Ralph Diaz, discussed amended expansions for NDPF for 2018-2019. Memo was sent to Associate Directors, Division of Adult Institutions, Wardens, Classification Staff Representatives, Classification and Parole Representatives and Correctional Counselors III, Reception Centers. Said memo provided an updated outline of the facilities that were scheduled to convert into NDPF and when the transition was scheduled for implementation. It again stated, "It is CDCRs goal to slowly transition all Level 1, Level 2 and select Level 3 housing facilities into NDPFs, as they currently house a large population of programming inmates".

CDCR Memorandum dated May 15, 2019 written by Connie Gipson (Director of Division of Adult Institutions) provided an update on NDPF. Memo was sent to Associate Directors, Division of Adult Institutions, Wardens, Classification Staff Representatives and Classification and Parole Representatives. Said memo stated, "NDPF will be involuntary." Memo also stated that, "Staff shall utilize the procedures identified within this memorandum pending regulatory changes to

CCR, Title 15" corroborating CDCR wants to make NDPF a formal policy. Moreover, memo states, in the last sentence of Attachment A, "In the event the inmate had prior SNY housing, the SNY AD [Administrative Determinant] shall remain affixed and will be solely utilized as a prior SNY identifier," but yet it's noted in mostly all previous memos and noted in this one as well that NDPF facilities, "does not use the Sensitive Needs Yard (SNY) or General Population (GP) identifiers where inmates are expected to program together at lower security levels

**Rules Violation Reports (RVRS) – CDCR 115s/Incident Reports**

I am the custodian of multiple inmate write-ups (rules violation reports) and incident reports, which prove the grave amount of violence that takes place when NDPF is implemented in a prison, more specifically the harm that the General Population (GP) prisoners are experiencing. I have these documents and would share under protective order, if granted.

Based on the research I did, I started to gather information from families at facilities where they had already integrated to obtain further insight. Some of the incidents included riots, injuries including stabbings, beatings with locks and other assaults at North Kern State Prison, New Folsom, Corcoran and Pleasant Valley State Prisons.  I asked families to send me their 115s along with any other evidence, and began receiving mail from families and people inside whenever possible. I also met people who were given 115s related to NDPF related incidents, and then transferred to Avenal. I began to create a timeline and supporting documentation of all the incidents I heard about.

Incident Reports from May 29, 2018, at Corcoran State Prison, level 1 facility, there was a "riot" when, "inmates from a non-designated segregation arrived."  Officers had to utilize their weapons on those prisoners they are sworn to keep safe; weapons that should not be utilized in the first place if both populations of prisoners were not integrated.  Medical Report and RVR are also included in

1   the packet.

2
3   Multiple incident reports from May 31, 2018, at North Kern State Prison, new arrivals (GP
    prisoners) arrived on the yard and, "the SNY inmates came out of the dorm and formed a line…
4   riot ensued." Injuries that were sustained were, "abrasions and scratches, active bleeding, slashes,
5   cuts and lacerations." There are pictures with injuries.

6
7   RVR from May 31, 2018, at North Kern State Prison regarding the incident described above as a
    "riot." Report mentioned fifteen SNY prisoners and sixteen GP prisoners were involved, but not
8   all were able to be identified. Officers had to utilize their weapons on those prisoners they are
9   sworn to keep safe; weapons that should not be utilized in the first place if both populations of
10  prisoners were not integrated. Also included is an Administrative Segregation Unit Placement
11  Notice for a GP prisoner in regards to the riot and a few medical reports to show wounds received
12  by a few prisoners.

13
14  Incident Report from July 25, 2018, at Salinas Valley State Prison, in an attempt to integrate GP
    inmates with SNY inmates upon the Minimum Facility resulted in three incidents and two riots at
15  1456 hours, 1525 hours and 1618 hours.

16

17
18  RVR from August 7, 2018, at Salinas Valley State Prison, Facility D, while, "monitoring the
19  placement of Non-Designated Programming inmates…" there was an incident and incident was
20  labeled a "riot." Officers had to utilize their weapons on those prisoners they are sworn to keep
    safe; weapons that should not be utilized in the first place if both populations of prisoners were not
21  integrated. Incident Report has also been attached to RVR.
22

23  Incident Reports from August 8, 2018, at Salinas Valley State Prison, M Yard, while, "monitoring
24  the placement of Non-Designated Programming inmates…" there was a "riot" and officers had to
25  utilize their weapons on those prisoners they are sworn to keep safe; weapons that should not be
    utilized in the first place if both populations of prisoners were not integrated. . There were two GP
26  prisoners that were attempted to be integrated in SNY housing. The riot included two GP prisoners
27  and three SNY prisoners and GP prisoners were labeled the suspects. Injury documents have also
28  been provided.

RVR from January 10, 2019 at California Rehabilitation Center (CRC), Facility B, there was a riot, "during integration between NDPF Facilities in the Vocational Auto compound." Officers had to use 40 MM launchers and OC blast grenades; weapons that should not be utilized in the first place if both populations of prisoners were not integrated.

An article was published, "Inmate Riots and Injuries Reported in the Wake of New State Prison Program" on December 26, 2018 with the initial proof that had been gathered from prisoners detailing their injuries and the violence created (https://www.kcbx.org/post/inmate-riots-and-injuries-reported-wake-new-state-prison-program?fbclid=IwAR3YvJZlfnDE-REz2xa977WhJ4yVAk49Uu2iulx52nb4UMg11okfCuMv-JA#stream/0).

**Riots based on NDPF implementation**

The following are a few articles written about the violence that have erupted due to NDPF implementation. Some have been directly taken from CDCR website and they state the riot is being investigated, but staff is well aware that NDPF is to blame for the violence. It has to be noted that the violent conditions created by NDPF put the Plaintiff at substantial risk of suffering serious harm and by not taking reasonable available measures to abate that risk, the Defendants, themselves, caused the Plaintiff's injuries.

On December 10, 2018, there was a riot at Richard J. Donovan Correctional Facility (https://www.cdcr.ca.gov/news/2018/12/10/richard-j-donovan-correctional-facility-officials-investigating-riot/) and again on February 15, 2019 at the same facility (https://www.cdcr.ca.gov/news/2019/02/15/richard-j-donovan-correctional-facility-investigating-riot/).

On June 4, 2019, there was a riot at Alder Creek Conservation Camp (https://www.cdcr.ca.gov/news/2019/06/04/california-department-of-corrections-and-rehabilitation-officials-investigating-riot-at-alder-creek-conservation-camp/). The Sacramento Bee also created an article in relation to this riot on June 4, 2019

(https://www.sacbee.com/news/politics-government/the-state-worker/article231180628.html?fbclid=IwAR38_5YC4tyWBvlFtn-SuJRYz3TNTgRsH4jkeDj9Z3-14NoqfBid2lb90DM).

On August 30, 2019, there was a riot at CCC in Susanville, CA where approximately 400 inmates were involved (https://www.cdcr.ca.gov/news/2019/08/30/california-correctional-center-investigating-riot/). The Associated Press also published an article about this riot on August 30, 2019 (https://www.yourcentralvalley.com/news/california/inmates-staff-injured-in-3rd-california-prison-brawl-in-3-days/?fbclid=IwAR0BBqYVLtfTKmkNsH-w_N09QwPv56yHUtxrPfMjon3kl29wwR5Rjsx1jxM). The Lassen County Times also published an article about this riot on August 30, 2019 (https://www.lassennews.com/several-injured-during-ccc-riot/?fbclid=IwAR1hf9STAONtLl9PgixK-cA0lCCLHbqyp_Vjqq5-xmUXza7StAMaIlaL-T4).

On August 29, 2019, there was a riot at California Men's Colony (CMC) in San Luis Obispo where approximately 50 inmates were involved (https://www.cdcr.ca.gov/news/2019/08/29/california-mens-colony-investigating-riot-2/). Fox 11 News also published a story about this riot on August 29, 2019 (https://www.keyt.com/news/crime/second-riot-reported-at-california-men-s-colony-in-2-days/1114829605?fbclid=IwAR1jzCiMKtoo4B-T1NuTlx40BPjq7tsyMq2S_-mMsM64TP4Q9rqnYKk9UF8).

On August 28, 2019, at CMC, there was a riot involving approximately 40 inmates (https://www.cdcr.ca.gov/news/2019/08/29/california-mens-colony-investigating-riot-2/). Fox 11 News also published a story about this riot on August 28, 2019 (https://www.keyt.com/news/san-luis-obispo-county/department-of-corrections-investigating-riot-at-california-men-s-colony-in-slo-county/1114398647?fbclid=IwAR1ZoWVU4q8XcB-kJpqAxxs1eJvaLf8SclKLWPx7jRodSpNQ8gs1yh_Jz8g).

**Notice to CDCR**

With the mounting evidence of violent outcomes, we family members, came together to gather information and evidence to prove that NDPF is, in fact, causing grave amounts of violence in CDCRs lower level prisons. As I was advocating for impacted families, much to my horror and dismay, I too, became an impacted family member, as my husband was subjected to numerous accounts of violence at RJ Donovan Correctional Facility.

On October 17, 2018, a letter was sent to Secretary Ralph Diaz notifying him there will be an increase in violence, serious injuries and deaths throughout the system due to the NDPF implementation.  Said letter was signed by multiple organizations standing in solidarity with family members with incarcerated loved ones as well as those incarcerated.

On November 2, 2018, a handful (about 10) of family members and advocates rallied outside of CDCR headquarters and then sat down to speak with Secretary Ralph Diaz and his command staff. We all voiced our opinions to Diaz in regards to NDPF.  There were a few personal stories provided, which were very emotional.  One family member spoke about her declining health and how the stress of NDPF is negatively affecting her health. She is terminally ill. Mr. Diaz was informed of the multiple policies that CDCR is breaking with NDPF as well as their own mission statement that begins with, "We enhance public safety through safe and secure incarceration of offenders..."  It was advised that integrating two groups of prisoners that have different classifications, for safety concerns, is not safe and secure and the lives of our incarcerated loved ones are at risk when they are placed in imminent danger.   We also asked command staff to provide statistics on NDPF yards as we, as family members, know there will be a huge disparity between SNY and GP prisoner participants in NDPF yards, since they claim that over 33,000 inmates are already programming positively, but statistics were not provided.  It was also expressed repeatedly that inmates were suffering not only violent effects, but were also at risk of losing their good time credits, release dates, and picking up additional charges due to this forced integration. Inmates that were victims were put down as aggressors, and those that were victimizing General Population inmates were free to continue their tyranny. Mr. Diaz was also provided with the October 17, 2018, letter in person as well as a petition created by family members going against NDPF, which had approximately 6,000 signatures.  At the end of the meeting, Diaz stated NDPF

1   will be placed on a "hiatus," but that statement was a lie as the implementation and violence

2   connected to NDPF continued.

3   On February 15, 2019, family members again met with Secretary Ralph Diaz and his command

4   staff at CDCR headquarters. Mr. Diaz was informed of the amount of violence CDCR is creating

5   with the NDPF implementation. A calendar was requested of the upcoming NDPF implementation

6   in the level 1 and level 2 facilities that have not been integrated yet, since that information was

7   previously made public in memos, but he refused to provide said documents. Diaz was also

8   informed that NDPF is a twist to the Ashker case where it ended indeterminate solitary

9   confinement (SHU) in California. He was advised that prisoners were released from SHU after

10  that settlement, and out to the mainline, and now CDCR creates violence with NDPF so they have

11  a chance to "prove" that certain individuals need to return to the SHU, even though the violence is

12  created and promoted by CDCR themselves. Diaz was unable to respond that statement. Diaz was

13  also presented with a multitude of information and inappropriate comments from his staff in a

14  Facebook group called Gladiator School. He was informed of how CDCR staff in the Facebook

15  group speaks proudly of the riots or act of violence caused by the bloodshed of NDPF; he simply

16  stated he could not control his staff's comments on social media.

**CDCRs Knowledge**

CDCR has also openly admitted that SNY prison gangs have emerged and are, "the largest

protective custody population in the nation." They even referred to the issue as an, "SNY

problem" that emerged. What's more, CDCR has also admitted that these SNY gangs have been

the cause of "escalating violence."

(https://insidecdcrcagov.mystagingwebsite.com/2018/04/secretarys-corner-cdcr-tackling-tough-

issues/). CDCR knows and understands that the NDPF implementation placed the Plaintiff, Jose

Montalvo, at substantial risk of suffering serious harm and by not taking reasonable available

measures to abate that risk, the Defendants caused the Plaintiff's injuries.

CDCR's Ombudsman's office has also been aware of the situation since the very beginning. I have

numerous emails sent to the Ombudsman, Eric Joe, who is the Ombudsman for RJ Donovan.

Absolutely nothing was done when I advised the severity of my husband's situation at RJ

Donovan. Rather, he advised me to contact Warden Covello directly, whom was the person whom

ordered my husband to be placed on an integrated yard a third time. I spoke directly with the Warden's assistant as a result of my communications with Eric Joe. I was advised that my husband was not telling me the truth about the incidents. I advised that I had visited him behind glass and could attest to the injuries visible to me. Shortly after my dialogue, my husband was strip searched in administrative segregation as retaliation for my questioning the lies in his documentation and the unnecessary repeated incidents they continued to subject him to. I also brought to their attention the that an attorney wanted to do a legal visit with my husband, and they were purposely delaying the process so that an officer of the court could not document the injuries my husband sustained. I also contacted Ralph Diaz' secretary thereafter and then they finally called my husband to committee to transfer him out after all of the suffering we both sustained and the orders of CDCR.

Not only is CDCR aware of the violence they are creating, but I also filed a complaint with the Office of the Inspector General, and they are well aware of the violence taking place. OIG emailed me a generic response in regard to my concerns with NDPF and Warden Covello's conduct. They stated the matter was to be reviewed by the local office. The Governor's office has also been made aware of the situation on multiple times by multiple families, still once again there is no relief.

**Harm to People Inside**

Not only is NDPF causing major physical violence, that could be prevented, but prisoners are losing the possibility of paroling. Specifically, there is one GP prisoner that was housed in CTF Central (GP yard), but was sent to CTF South (level 1) before the NDPF integration. Unfortunately, a few months later, in an attempt to integrate the yard, her husband was in the vicinity where a large-scale riot took place on December 21, 2019. He was sent to Administrative Segregation pending a write-up. Shortly thereafter, he received a write-up with a referral to the District Attorney for Attempted Murder charges. Numerous families were present at CTF prison on December 21, 2019, protesting NDPF and took video of ambulances going in and out of the prison. The prisoner's wife was also outside protesting NDPF and was actually on the phone with her husband when the riot occurred. Her husband had left the phone hanging and she overheard the officers telling the prisoners to get down. This is the lowest level of security in a California State Prison where violence is minimal; yet, a full scale riot ensued as a result of NDPF implementation.

**Harm to Family Members**

Along with being an advocate for prisoners and family members, my husband was formerly incarcerated and negatively impacted by this program. The severe mental and emotional anguish I have had to endure knowing that my husband was placed on an NDPF yard and forced to fight for his life was unbearable. I hardly have words for the horrific nightmare I lived. My husband had no history of violence in 21 years total incarceration. He was programming and was a model inmate with regard to behavior, education, self-help and mentoring youth. He was forcefully placed in a situation where he had risk all his hard work and extend his time incarcerated suffering consequences for violence that was forced upon him not once, not twice but three times.

The mental and emotional distress I endured is immeasurable, and I truly feel that this has traumatized me. My husband, thankfully, is home and out of harm's way. However, this experience has horrific effects on us family members whom cherish our loved ones. I developed extreme anxiety, insomnia, high blood pressure, and don't want my husband out of my sight, because I am so scarred by what I endured. This is only my story, and my direct experience; however, there are many families that I have spoken with and tried to console. The panic and sheer terror instilled in the families is atrocious. Some family members have had to deal with the anguish of having their loved ones parole dates get taken away when involved in violence, further jeopardizing their opportunities to come home.

We had a second rally at CDCR on December 14th, and followed up with the staff of state legislators who we had met with in November. Additional elected officials reached out and were given varying and contradictory answers from CDCR. Ralph Diaz still hadn't responded to our initial demands. Meanwhile, incidents including riots and assaults due to forced integration

1    continued to escalate.

2

3    This program has caused so much heartache, emotional distress and mental anguish for both the

4    incarcerated and their family members. The proof of wrongdoing and the multitude of violent

5    outcomes is in the documentation. Wherefore, I am submitting this amended declaration in support of

6    Jose Montalvo's Order to Show Cause.

7

8

9    Pursuant to 28 USC 1746, I declare under penalty of perjury that the foregoing is true and correct,

10   dated this 15th day of February, 2020 in Clovis, California.

11   _____

12                                                           Ruthie Montalvo

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

To Reuse Envelope:   1 Peel off old labels   2 Fold this flap down   3 Expose adhesive   4 Fold top flap down   5 Press this flap up to seal

▶▶▶                                                                    PULL TAB TO OPEN ◀ ◀◀

**Visit ups.com® or call 1-800-PICK-UPS® (1-800-742-5877)**
to schedule a pickup or find a drop off location near you.

**Domestic Shipments**
- To qualify for the Letter rate, UPS Express Envelopes may only contain correspondence, urgent documents, and/or electronic media, and must weigh 8 oz. or less. UPS Express Envelopes containing items other than those listed or weighing more than 8 oz. will be billed by weight.

**International Shipments**
- The UPS Express Envelope may be used only for documents of no commercial value. Certain countries consider electronic media as documents. Visit ups.com/importexport to verify if your shipment is classified as a document.

- To qualify for the Letter rate, the UPS Express Envelope must weigh 8 oz. or less. UPS Express Envelopes weighing more than 8 oz. will be billed by weight.

**Note:** Express Envelopes are not recommended for shipments of electronic media containing sensitive personal information or breakable items. Do not send cash or cash equivalent.

This envelope is for use
with the following services:

**UPS Next Day Air®**
**UPS Worldwide Express®**
**UPS 2nd Day Air®**

Do not use this envelope for:

**UPS Ground**
**UPS Standard**
**UPS 3 Day Select®**
**UPS Worldwide Expedited®**

Apply shipping documents on this side

RECEIVED
COURT SECURITY

FEB 14 207.

U.S. MARSHALS    /ICE

# Reusable Express Envelope
## Legal Size

Reduce paper waste by using this envelope a second time —
either to return to sender or to ship to another recipient.
See reuse instructions on flap above.

## Decision Green℠

Decision Green is UPS's environmental platform, reflecting
our pursuit of sustainable business practices worldwide.
For example, this envelope is made from 100% recycled
material and is both reusable and recyclable.

 100% Recycled fiber
80% Post-Consumer

International Shipping Notice — Carriage hereunder may be subject to the rules relating to liability and other terms and/or conditions established by the Convention for the Unification of Certain Rules Relating to International Carriage by Air (the "Warsaw Convention") and/or the Convention on the Contract for the International Carriage of Goods by Road (the "CMR Convention"). These commodities, technology or software were exported from the U.S. in accordance with the Export Administration Regulations. Diversion contrary to U.S. law prohibited.

01019511212   1/15   TG   United Parcel Service



**UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

JOSE MONTALVO,                    Case No. 19-CV-00363-CAB

Plaintiff,

VS.                                              **PROOF OF SERVICE**

RALPH DIAZ, et al.,

Defendants.


I hereby certify that on February 18, 2020, I served a copy of the attached **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS,** by depositing said envelope in the United States Mail at Clovis, California, 96311 as SAME DAY DELIVERY, addressed to the person below:


Michelle Des Jardines

Supervising Deputy Attorney General

Office of the Attorney General

600 West Broadway

Suite 1800

San Diego, Ca. 92101


I declare under penalty of perjury that the foregoing is true and correct,


Jose Montalvo,

Pro Se Plaintiff